UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-mj-45 (KMM/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S RESPONSE** |
| v. | ) | **TO DEFENDANT'S MOTION** |
| | ) | **TO DISMISS FOR** |
| JOSE ROBERTO RAMIREZ, | ) | **OUTRAGEOUS** |
| | ) | **GOVERNMENT CONDUCT** |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, William L. Richards, Special Assistant United States Attorney, hereby submits the Governments response to Defendant's Motion to Dismiss for Outrageous Government Conduct. The motion should be denied because the government's conduct reflects routine, lawful federal law enforcement activity, and Defendant cannot meet the "narrow band of the most intolerable government conduct" required for dismissal. The United States further respectfully requests leave to file supplemental briefing if necessary.

## INTRODUCTION

Federal immigration enforcement is a core exercise of the United States' sovereign authority to regulate entry, presence, and removal of non-citizens.

U.S. Const. art. I, § 8; U.S. Const. art. II, § 3; See *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952); *Arizona v. United States*, 567 U.S. 387, 396–97 (2012); *United States v. Texas*, 143 S. Ct. 1964, 1973–74 (2023).

Multi-agency enforcement operations are a longstanding feature of modern federal law enforcement practice.

"Operation Cross Check" is an ongoing multi-state ICE enforcement initiative to identify, arrest, and remove individuals with criminal records. Since its launch, it has resulted in thousands of arrests and removals. U.S. Immigr. & Customs Enf't, Enforcement and Removal Operations (ERO) Fugitive Operations Program, https://www.ice.gov/identify-and-arrest/fugitive-operations (last visited Apr. 9, 2026).

"Operation Metro Surge" was a coordinated multi-agency law enforcement operation in Minnesota.

"Operation Legend", a DOJ-led violent crime initiative involving the FBI, ATF, DEA, and U.S. Marshals Service, resulted in over 1,000 arrests across multiple jurisdictions. U.S. Dep't of Just., *Attorney General Announces Expansion of Operation Legend*, https://www.justice.gov/opa/pr/attorney-general-announces-expansion-operation-legend-nationwide-initiative-combat-violent (last visited Apr. 9, 2026).

"Operation Broken Heart", conducted through the Internet Crimes Against Children Task Force Program, resulted in approximately 1,700 arrests

nationwide through coordinated federal, state, and local enforcement efforts. Off. of Just. Programs, U.S. Dep't of Just., *Nearly 1,700 Suspected Child Sex Predators Arrested During Operation Broken Heart,* https://ojp.gov/news/press-releases (last visited Apr. 9, 2026).

"Operation Community Shield" is a long-running nationwide gang enforcement initiative led by ICE Homeland Security Investigations, that has resulted in the arrest of gang members and transnational criminal organization affiliates across the United States since its inception. U.S. Immigr. & Customs Enf't, *Operation Community Shield,* https://www.ice.gov/features/community-shield (last visited Apr. 9, 2026).

Taken together, these operations demonstrate that large-scale, coordinated enforcement operations are a routine feature of modern federal law enforcement practice.

## CASE BACKGROUND

On January 8, 2026, ICE Enforcement and Removal Operations (ERO) officers participating in "Operation Metro Surge" conducted a targeted enforcement operation in Robbinsdale, Minnesota, seeking a subject with a final order of removal and a criminal history including aggravated assault and driving under the influence.

While surveilling the target residence, officers observed individuals and a vehicle consistent with the target description. Officers then observed a white

BMW departing the residence at a high rate of speed and initiated a lawful stop based on the totality of the circumstances.

Officers activated emergency lights and sirens, but Defendant Jose Roberto Ramirez refused to stop. Instead, he drove recklessly, ran multiple red lights, and continued to evade law enforcement. Defendant eventually entered a shopping center parking lot, exited his vehicle, and entered a second vehicle on scene. Officers issued repeated verbal commands, which he ignored.

Defendant refused to provide identification and obstructed efforts to secure compliance and verify his identity.  then moved his phone toward an officer's face, prompting the officer to deflect it for safety. Defendant punched the officer in the face, causing an injury that required medical treatment. Officers then removed Defendant from the vehicle and placed him under arrest.

Following arrest, Defendant waived his *Miranda* rights and gave a recorded statement. He admitted he saw emergency lights and sirens, intentionally refused to stop, knew the individuals were federal officers, ignored their commands, and struck a federal officer in the face.

## LEGAL STANDARD: OUTRAGEOUS GOVERNMENT CONDUCT IS AN EXTRAORDINARY and NARROW DOCTRINE

Dismissal based on outrageous extraordinary conduct is an

"extraordinary remedy" reserved only for the "narrow band of the most intolerable government conduct." See *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (citing *United States v. Russell*, 411 U.S. 423, 432 (1973) and *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003)). The doctrine applies only where conduct that is "so shocking, outrageous, and clearly intolerable that it offends the universal sense of justice." *Russell*, 411 U.S. 423, 432 (1973); *Combs*, 827 F.3d at 794. To prevail, Defendant must show either (1) excessive government involvement in creating the crime, or (2) significant coercion inducing the defendant's criminal conduct. *King*, F.3d at 867. The doctrine is reserved for rare circumstances at the extreme outer bounds of due process.

## ARGUMENT

The Government's conduct was lawful and well within routine enforcement activity. Officers did not create, induce, or coerce the charged offenses; rather, Defendant's own voluntary actions gave rise to the conduct at issue. Because this case falls far outside the narrow and extraordinary doctrine of outrageous government conduct, the motion should be denied.

## I. THE GOVERNMENT'S CONDUCT WAS LAWFUL AND WITHIN ROUTINE ENFORCEMENT ACTIVITY

Officers were conducting a lawful immigration enforcement operation

targeting an individual with a final order of removal and a documented criminal history. They engaged in surveillance, observed evasive conduct, and initiated a stop based on articulable facts. These are routine investigative techniques consistently upheld by courts. *Combs*, 827 F.3d at 794–95.

Coordinated, multi-agency enforcement does not transform lawful conduct into constitutional wrongdoing. Federal agencies regularly conduct multi-agency enforcement initiatives involving coordinated surveillance and arrests across jurisdictions. Such operations are a longstanding and accepted feature of federal law enforcement. Nothing about this operation its scope, staffing, or execution places it outside "permissible law enforcement tradition." *Id.* at 795; (See *Operation Legend*, *Operation Broken Heart*, *Operation Community Shield*).

Nothing in this record resembles "government-created criminal activity." In *United States v. Twigg*, the government conceived, funded, and ran an entire methamphetamine operation, rendering the defendant a subordinate position. 588 F.2d 373, 375–76, 382 (3d Cir. 1978). By contrast, the officers did not create any criminal activity and did not propose, facilitate, or control Defendant's conduct. No comparable Government creation or control exists here.

Courts have rejected far more intrusive claims. In *United States v. Hunt* the government supplied large quantities of precursor chemicals for drug manufacturing, yet the no due process violation was found. 171 F.3d 1192,

1195 (8th Cir. 1999). In *United States v. Simpson*, the use of an informant who maintained a sexual relationship with the defendant likewise did not meet the standard. 813 F.2d 1462, 1465 (9th Cir. 1987). Compared to those cases routine surveillance and a lawful investigatory stop fall well short of conduct that is constitutionally outrageous or that would "shock the conscience" under controlling due process standards.

No specific facts were alleged establishing the Government created the crime for which Defendant was charged. No specific arguments allege how the actions of the Government coerced or induced the actions of Defendant. Routine investigative and arrest activity does not meet the demanding standard for outrageous government conduct.

Defendant's argument is insufficient as a matter of law. Dismissal of a case based on alleged outrageous government conduct is an extraordinary remedy that applies only in the rarest of circumstances. This is clearly not one of those extremely rare cases.

## II. DEFENDANT'S CONDUCT WAS NOT VOLUNTARY AND INDEPENDENT

The doctrine requires government creation or coercion of criminal conduct. *King*, 351 F.3d at 867. That showing is absent. This case turns on

Defendant's own choices. Defendant's conduct was entirely voluntary and self-directed.

The conduct underlying the charges show that Defendant observed emergency lights and sirens and intentionally refused to stop; fled through multiple red lights and drove dangerously; ignored repeated lawful commands; obstructed identification efforts; and ultimately punched a federal officer in the face, causing injury requiring medical treatment.

Defendant further admitted, in a recorded, post-*Miranda* interview, that he saw the emergency lights, he intentionally refused to stop, he knew the individuals were federal officers, and he struck the officer.

The facts foreclose any claim of coercion or government overreach. Instead, these facts reflect voluntary, independent criminal conduct. Courts routinely reject outrageous conduct claims where defendants are active participants rather than coerced actors. *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997).

Here, Defendant's criminal conduct escalated independently in response to lawful police activity, culminating in a physical assault on a federal officer. No evidence suggests inducement or overreach. Defendant's own decisions further sever any causal link between law enforcement activity and the charged offenses. Therefore, the claim is without merit and should be denied.

## III. THE GOVERNMENT DID NOT CREATE, INDUCE, OR COERCE THE OFFENSE

Outrageous government conduct requires government creation of the crime or coercion of the defendant's will. *King*, 351 F.3d at 867. Defendant cannot satisfy either prong of *King*. Officers did not direct Defendant to flee, resist, or assault anyone. They did not provide tools, encouragement, or opportunities for criminal conduct. Instead, Defendant independently chose to evade law enforcement and escalate the encounter. His conduct was self-directed at every stage. That independently defeats his claim. Id.

This case is fundamentally unlike *Twigg*, where the government engineered the entire criminal enterprise. It is also less extreme than *Hunt* and *Simpson*, where courts still rejected outrageous conduct claims despite significantly greater government involvement. Under *Combs* and *Russell*, participation in legitimate enforcement activity even if extensive does not violate due process. 827 F.3d at 794; 411 U.S. at 432. Nothing here approaches conduct that "shocks the conscience."

This case bears no resemblance to the rare situations where courts have even considered applying the doctrine. Compared to those cases, the conduct here routine surveillance, a lawful stop, and a defendant's violent resistance is nowhere near the constitutional threshold. Accordingly, the motion should be denied.

## IV. GENERALIZED POLICY OBJECTIONS ARE IRRELEVANT

Defendant attempts to recast routine enforcement as unconstitutional by challenging immigration operations more broadly. This approach is legally irrelevant. Courts evaluate outrageous conduct claims based on the Government's actions in Defendant's specific case and not generalized objections to enforcement policy.

Even the cases Defendant relies on focus on conduct tied directly to the charged offense. See, e.g., *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992). Here, the only conduct at issue is a lawful stop, attempted identification, and arrest, none of which is remotely outrageous. The remaining allegations concern generalized enforcement activity unrelated to the conduct charged and are not properly considered in this motion. Therefore, the motion should be denied.

## V. NO EVIDENTIARY HEARING IS REQUIRED

An evidentiary hearing is not warranted where the defendant's allegations, even if accepted as true, fail to establish a constitutional violation as a matter of law. *Combs*, 827 F.3d at 794-95. Defendant's motion does not identify disputed facts material to that legal inquiry, but instead describes routine investigative steps, including surveillance, a traffic stop supported by articulable facts, identification efforts during a rapidly evolving encounter, and

arrest following active resistance. Such conduct falls well within permissible law enforcement tradition.

Even crediting Defendant's version of events, the record reflects voluntary flight from law enforcement, repeated refusal to comply with lawful commands, and an assault on a federal officer following a lawful stop. Defendant further admits to such conduct in a recorded, post *Miranda* interview. Those facts, taken at their highest, do not approach the "narrow band of the most intolerable government conduct" required for dismissal. *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003).

No material factual dispute exists that would alter the legal analysis. The issue is purely legal and may be resolved on the motion record. The defendant's remaining contentions are generalized policy objections that are irrelevant. Accordingly, no evidentiary hearing is required, as the motion presents a purely legal question resolvable on the existing record.

## CONCLUSION

The Government's conduct was lawful and well within routine enforcement activity. The Government did not create, induce, or coerce the charged offenses, rather, Defendant's own choices led to the conduct at issue. The facts therefore fall squarely within established law enforcement practice. The standard for outrageous government conduct is reserved for only the most

extreme and conscience-shocking circumstances, and this case does not approach that threshold under controlling precedent. The United States respectfully requests that the Court deny Defendant's motion to dismiss as a matter of law and deny the request for an evidentiary hearing in its entirety.

Dated: April 10, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*s/William L. Richards*
BY: William L. Richards
Attorney ID No.: 5445002NY
Special Assistant U.S. Attorney
300 South 4th Street, Suite 600
Minneapolis, MN 55415
T: 612.664-5600| C: 202-230-8076
Email: William.Richards@usdoj.gov