**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Jose Roberto Ramirez,<br><br>Defendant. | Case No. 26-mj-45 (KMM/DTS)<br><br><br><br>**ORDER & REPORT AND RECOMMENDATION** |

---

## INTRODUCTION

In any ordinary sense of the word, the Government's conduct in this case is outrageous. Unable to secure the arrest of the person they came for, ICE agents, without probable cause, pursued and forcibly arrested defendant Jose Roberto Ramirez—a United States citizen who happened to be in the neighborhood and "matched" the generic description of the wanted man—"medium complexion, black hair." But while the Government's conduct is outrageous in the ordinary sense, it falls short of the narrow legal definition of that term. As a result, the Court must recommend denial of Ramirez's motion to dismiss the criminal charges against him. However, because ICE's initial stop of Ramirez violated his Fourth Amendment rights, the Court recommends granting in part Ramirez's motion to suppress. The Court denies Ramirez's remaining three pretrial motions.

## FINDINGS OF FACT

On January 21, 2026, the Government charged Ramirez by criminal complaint with forcibly assaulting, resisting or impeding Immigration and Customs Enforcement agents. Dkt. No. 1; Dkt. No. 1-1. A month later, on February 17, 2026, the Government filed an

information clarifying that Ramirez was charged with a Misdemeanor under the statute, Dkt. No. 14, making this case one of at least 27 such Misdemeanor cases in this district charging individuals with assault on a federal officer in violation of 18 U.S.C. § 111(a)(1). *See* Dkt. No. 24.

Ramirez has moved to (1) dismiss the Information for outrageous government conduct, Dkt. No. 28; (2) suppress all evidence unlawfully obtained incident to his stop and detention, Dkt. No. 27; (3) disqualify government's counsel under the Posse Comitatus Act, Dkt. No. 29; (4) compel discovery, Dkt. No. 30; and (5) compel early disclosure of Jencks Act material, Dkt. No. 31. The Court held an evidentiary hearing on Ramirez's dismissal and suppression motions on April 22, 2026. Hrg. Tr., Dkt. No. 45. A single witness, ICE Agent Paul Rivera, testified. Hrg. Tr. at 6-83.[1]

On January 8, 2026, Agent Rivera and a team of eight other ICE agents were surveilling 2115 Emerson Avenue North in Minneapolis. *Id.* at 7-9, 27. They were searching for an Ecuadorean national named Charly Pallo Moreno. *Id.* at 8; Def. Ex. 1. According to Agent Rivera, 2115 Emerson North was the last known address of Moreno, who was in the country illegally, was subject to a final order of removal, and had a criminal history that included aggravated assault and a charge of driving under the influence. Hrg. Tr. at 9-10; Def. Ex. 1. Agent Rivera described Moreno as "a male with medium complexion, black hair, with a Hispanic origin," and noted he had viewed a photograph of Moreno in his immigration profile. Hrg. Tr. at 8, 28; Def. Ex. 1. He testified it was his

[1] Agent Rivera was not the affiant for the original criminal complaint in this matter. For reasons explained in section II.A of this Report and Recommendation the Court finds Agent Rivera to be not a credible witness. Therefore, in making its factual findings, the Court primarily relies on the objective evidence and on undisputed facts.

understanding he could lawfully stop anyone who matched Moreno's description. Hrg. Tr. at 26.

Agent Rivera and his team tried to stop three Hispanic individuals all of whom appeared to them to match Moreno's description. *Id.* at 32, 61. His team had parked at both ends of the alley behind 2115 Emerson North. *Id.* at 79-80. Agent Rivera spotted two Hispanic males parked in a car behind the house. *Both* men "matched" Moreno's description. *Id.* at 11-12, 32-33. They both fled on foot when ICE agents approached. *Id.* at 12. One of the men entered a nearby McDonalds, the other ran back toward 2115 Emerson North. *Id.* at 12, 39, 44. Agent Rivera followed the man who entered the McDonald's despite having determined that he was not Moreno. *Id.* at 13, 32-35. Agent Rivera waited 10 to 15 minutes outside the McDonalds in an unsuccessful attempt to arrest the non-suspect.[2] *Id.* at 80.

Agent Rivera and his team then returned to 2115 Emerson North. *Id.* at 47. Upon their return, Agent Rivera saw a man driving a BMW in the general vicinity of 2115 Emerson North. *Id.* at 49. The man was later identified as Ramirez. Agent Rivera testified that Ramirez appeared to match the general description of Moreno—"Hispanic male, black hair, medium complexion." *Id.* at 51. The BMW was not the same car Agent Rivera had previously seen parked behind 2115 Emerson North. *Id.* at 52-53, 81. Based on these facts, Agent Rivera attempted to stop Ramirez by activating the lights and sirens of his unmarked Ford Explorer. *Id.* at 53-56. He testified Ramirez fled, "driving recklessly" due to his speed, "swerving lanes," and "blowing through multiple lights." *Id.* at 55.

[2] When Agent Ramirez first arrived at the McDonald's a security guard told him to leave and would not let him in the building. Hrg. Tr. at 41-42.

Eventually the BMW stopped in a parking lot near a Starbucks *Id.* at 16, 58. Agent Rivera approached the BMW and told Ramirez to roll down the windows, turn off the car, and place his keys and hands outside the car. *Id.* at 16-17. Ramirez responded by swearing at Agent Rivera and filming him with his phone. *Id.* at 16-17, 58. Ramirez then got out of the BMW and got into his aunt's car parked nearby. *Id.* at 61; Def. Ex. 2. ICE agents proceeded to open both doors of the aunt's car. Def. Ex. 2 at 00:20-00:26. They demanded Ramirez's identification and inquired about his citizenship status. *Id.* at 00:20-1:15. Ramirez stated that he had identification but could not find it. Hrg. Tr. at 18-19, 64. Throughout this encounter, Ramirez's aunt repeatedly informed ICE agents that Ramirez was a citizen and a Native American. Def. Ex. 2 at 00:30-1:15.[3]

Despite receiving this identifying information, Agent Rivera attempted to conduct a facial recognition scan of Ramirez. Hrg. Tr. at 19; Def. Ex. 2 at 2:30-2:40. Agent Rivera testified that Ramirez resisted this scan, putting his phone closer to Agent Rivera's face. Hrg. Tr. at 20, 70-73. Agent Rivera knocked the phone out of Ramirez's hand. *Id.* at 20, 70-73. Ramirez hit Agent Rivera in the face. *Id.* at 20, 74. Following this physical altercation, Agent Rivera and his team forcibly removed Ramirez from the vehicle, struck him multiple times, and arrested him. *Id.* at 75-76; Def. Ex. 2 at 2:43-3:25. Agent Rivera acknowledged at the suppression hearing that Ramirez was not the identified suspect, Moreno, and is a citizen. Hrg. Tr. at 68.

[3] Though not germane to the issues before the Court, the Court notes that ICE officers appeared to strike Ramirez's aunt. This use of force appears unprovoked. Def. Ex. 2 at 2:50-3:30.

## CONCLUSIONS OF LAW

### I. Motion to Dismiss for Outrageous Government Conduct

Ramirez moves to dismiss the criminal charges for outrageous government conduct. Dkt. No. 28. He contends ICE agents conducted an unlawful stop and seizure as part of a "massive racial profiling operation" and in doing so, employed violent methods to detain Ramirez, which provoked the conduct underlying the charge. *Id.* at 2; *see also* Dkt. No. 54 at 11-13.

The doctrine of outrageous government conduct derives from the Due Process Clause of the Fifth Amendment. *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012). Though the doctrine has never been successfully applied within this circuit, the Eighth Circuit has "left open the possibility that, in rare instances, the investigative methods employed by law enforcement could be 'so outrageous that due process bars the government from invoking the judicial process to obtain a conviction.'" *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (quoting *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003)). Dismissal under this doctrine is "reserved for conduct that falls within the narrow band of the most intolerable government conduct." *Id.* at 794-95 (quotation omitted). To meet this standard, the conduct must violate "'fundamental fairness'" and be so outrageous it "'shock[s] . . . the universal sense of justice, mandated by the Due Process Clause.'" *Id*. at 794-95 (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). "The level of outrageousness needed to prove a due process violation is 'quite high,' and the government's conduct must 'shock the conscience of the court.'" *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999) (quoting *United States v. Pardue*, 983 F.2d 835, 847 (8th Cir.1993)).

In practice, courts have rarely applied this doctrine to dismiss charges*. See Combs*, 827 F.3d at 795 (identifying only two appellate cases, both from the 1970s, "that have deemed the government's conduct so outrageous as to violate due process"). One of the few cases in which dismissal was warranted is *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). There, the government initiated and directed a drug manufacturing operation; it supplied the essential materials for the operation; it exercised near-total control over the criminal enterprise. *Id.* at 380-81. The defendants played a minimal role in the criminal enterprise—they expressed a willingness to participate in the drug manufacturing operation and provided some production assistance. *Id.* at 375-76, 380-81. *Twigg* illustrates the application of the doctrine. The Eighth Circuit has recognized that the doctrine applies, if at all, "almost exclusively to situations involving entrapment, where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity." *United States v. Boone*, 437 F.3d 829, 842 (8th Cir. 2006).

This case is different. Ramirez questions the propriety of the Government's conduct during his stop and seizure. Dkt. No. 28. He contends federal agents chased his vehicle in unmarked cars simply because he was "around the location where agents believe[d] their target was located, and his racial appearance." *Id.* at 2, 4. He further contends that after ICE agents stopped and detained him, they "violently knocked the phone out of his hand" before "violently remov[ing] him from the vehicle." Dkt. No. 54 at 12. According to Ramirez, these actions are "even more outrageous" when considered as part of "a larger deliberate operation by the federal government" to engage in a "campaign of terror against the people of Minnesota." Dkt. No. 28 at 4. The Court agrees the Government's conduct was egregious, if not despicable. It rejects the Government's

characterization of its conduct as acceptable routine practice. Dkt. No. 36 at 5. However, these actions do not constitute the type of conduct that courts applying the narrow doctrine of outrageous government conduct have recognized as falling within its scope. *Twigg*, 588 F.2d 373 at 380-81.

In this case Ramirez did not participate in a criminal enterprise created by the Government to entrap him. Ramirez attempts to fit this case within the narrow parameters of the doctrine by arguing that the ICE agents' conduct directly caused Ramirez's subsequent actions and the charged offense. *See* Dkt. No. 28 at 2; Dkt. No. 54 at 12. This may well be true and may provide a justification or defense a jury finds so persuasive as to return a verdict of not guilty. But it does not constitute the type of government direction of criminal activity necessary to warrant dismissal under the doctrine. Unlike in *Twigg*, the agents did not direct a criminal scheme, provide Ramirez with the means to commit an offense, or exercise control over Ramirez, such that he was a passive participant in the commission of the charged offense. Rather, Ramirez's alleged offense arose from his volitional decision to resist the ICE agents by force.

Because Ramirez fails to meet the standard necessary to establish outrageous government conduct, the Court recommends his motion to dismiss be denied.

## II. Motion to Suppress Evidence

Ramirez seeks to suppress all evidence obtained during this incident. Dkt. No. 27. The Fourth Amendment protects the "right of people to be secure . . . against unreasonable searches and seizures." U.S. Const., amend. IV. Subject to certain exceptions, evidence obtained from a search or seizure in violation of the Fourth Amendment must be suppressed. *See Davis v. United States*, 564 U.S. 229, 236–37

(2011) ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."); *see also United States v. Baez*, 983 F.3d 1029, 1036-37 (8th Cir. 2020). The Fourth Amendment's exclusionary rule includes all primary evidence found incident to an illegal search or seizure as well as evidence obtained as "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (quotation omitted). To be excluded, a defendant must first establish a "nexus between a constitutional violation and the discovery of evidence sought to be excluded." *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018). If the defendant establishes that nexus, then the government has the "ultimate burden of persuasion to show the evidence is untainted." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).

**A. Pursuit leading to initial stop**

Ramirez argues ICE agents unlawfully seized him without probable cause to suspect he was a "criminal alien." *See* Dkt. No. 27 at 2. The Government opposes Ramirez's motion, arguing ICE agents had reasonable suspicion to conduct an initial investigatory stop of Ramirez. Dkt. No. 38 at 4-8.

A seizure occurs whenever an officer "has in some way restrained the liberty of a citizen" through "physical force or show of authority." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968). It is well-established that "[i]mmigration officers 'may briefly detain' an individual 'for questioning' if they have 'a reasonable suspicion, based on specific articulable facts, that the person being questioned . . . is an alien illegally in the United States." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 1 (2025) (Kavanaugh, J., concurring) (quoting 8 C.F.R. § 287.8(b)(2)); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("[T]he Fourth Amendment . . . forbids stopping or detaining persons for questioning

about their citizenship on less than a reasonable suspicion that they may be aliens."). Whether reasonable suspicion exists depends on "the 'totality of the circumstances' of each case to see whether the detaining officer has 'a particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Reasonable suspicion requires "more than a mere hunch." *United States v. McMillion*, 101 F.4th 573, 576 (8th Cir. 2024) (quoting *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015)). This standard demands that the detaining officer "'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *United States v. Quinn*, 812 F.3d 694, 697 (8th Cir. 2016)).

The parties do not dispute Ramirez was seized. Dkt. No. 54 at 7; Dkt No. 38 at 4. The question is whether ICE had a reasonable suspicion that Ramirez—a Native American—was an illegal immigrant. Ramirez argues they did not; the Government argues it did. So, the Court turns to what the Government has articulated to establish its reasonable suspicion.

The Government relies almost exclusively on Agent Rivera's testimony to establish that the stop was objectively reasonable. Dkt. No. 38 at 1; Hrg. Tr. at 6-83. However, Agent Rivera is simply not a credible witness. This lack of credibility is exemplified by Agent Rivera's evasiveness, his misleading implications, and his frequent lapses in memory.[4] For example, Agent Rivera dodged questions about the length of his ICE training, requiring the Court's intervention.

COUNSEL: I see. And how long did your training last?

---

[4] The Court also had ample opportunity to observe Agent Rivera's demeanor during the 100 minutes he was on the witness stand. That did not bolster his credibility.

WITNESS: I do not remember exactly how long it lasted.

COUNSEL: Was it days, weeks?

WITNESS: What do you mean by that?

COUNSEL: You said you went to an academy, a basic training academy in Georgia, right?

WITNESS: Correct.

COUNSEL: How long did that training last?

WITNESS: I can't recall exactly the full duration of training.

COUNSEL: Was it a matter of days or weeks or months?

WITNESS: The length of time encompasses all three of those, so I'm confused on what you're saying.

COUNSEL: Well, how long did this academy last? Was it a matter of days? Was it a matter of weeks? Was it a matter of months?

WITNESS: I can't recall exactly the length --

COURT: Hang on a second. Excuse me. Officer Rivera, answer the question.

WITNESS: Yes, Your Honor.

COURT: Were you there months? Were you there weeks? Were you there days? It's not a hard question. Answer it, please.

WITNESS: Yes. I was there for roughly a month and a half.

COURT: Okay.

*Id.* at 22-23. Agent Rivera offered similarly evasive answers when questioned about whether, based on the information available today, he still believed Ramirez was the

same individual who initially fled toward 2115 Emerson North*.* *Id.* at 65-68. This exchange also required the Court's intervention. *Id.* at 67-68.

> WITNESS: We believed [Ramirez] to be the primary subject who fled from us at the target residence, fled from us leaving the target residence, and then fled from us leaving the vehicle that he was in into another vehicle.
>
> COUNSEL: But you realize you were wrong, right? First of all, he wasn't the same person who fled from you the first time, right?
>
> WITNESS: At that point in time, we weren't able to confirm his identity due to his non-compliance.
>
> COUNSEL: But as we sit here, you know that he was not the person who fled from you, the first person who fled from you, right?
>
> WITNESS: I'm operating in accounting --
>
> COUNSEL: I'm asking –
>
> WITNESS: -- of what happened at that point in time.
>
> COUNSEL: I'm asking you to just ascertain the facts. He was not the person who you thought originally fled, right?
>
> WITNESS: At that point in time --
>
> COUNSEL: Now, now. Now – as you sit here, do you know if he's the person that originally fled?
>
> WITNESS: He is the person that fled.
>
> COUNSEL: Is he the person that fled the first time? Is he the person that went into the McDonald's or went back towards the target residence?
>
> WITNESS: He appeared to be the primary subject that initially fled from the target residence.

COUNSEL: As you sit here, do you still believe he was that person who initially fled?

WITNESS: I operate with what I had at that point in time.

COUNSEL: Again, I'm asking now. Do you still believe he was the person who initially fled?

WITNESS: I believe that he appeared to match the primary subject that fled from the target residence.

COUNSEL: Based on the information you have now, do you still believe he was that person?

WITNESS: He is not the primary target, conclusion to any of our investigation or at that point in time.

COUNSEL: Right. He's not --

WITNESS: But upon the time of the arrest, he did not have his identification --

COUNSEL: But --

COURT: All right. Hang on. You can't talk over each other.

WITNESS: Yes, Your Honor.

COURT: Officer, the question that Mr. Kushner has asked you several times is: As you're sitting here today, right? April 22nd, 2026, is it still your belief that the person who fled toward the target house is Mr. Moreno?

COUNSEL: Mr. Ramirez.

COURT: I'm sorry. Mr. Ramirez. Thank you.

WITNESS: I believe that this individual sitting right there was the one that was fleeing from the primary subject – or target house at that point in time.

COURT: So, your belief today is he is the person that fled toward the target house and then later fled in the BMW. Is that correct? Is that your belief?

WITNESS: It is my belief that he left from the target residence. I'm confused on what this question is.

COURT: There were two – you've testified to two fleeing incidents: One where two people fled, one toward the target house, one to the McDonald's; and then a second fleeing incident in which two people – apparently a man and a woman – fled in a BMW.

What Mr. Kushner and I are now both asking you is: Was the person who fled in the BMW, do you believe that was the same person who fled toward the target house when you originally had a fleeing incident? Is it the same person?

WITNESS: I believe that the point in time from when we initially encountered two subjects at the primary target residence, one fleeing to the McDonald's, one going back to the primary target residence, at that point in time, I believed that the driver of that vehicle was the primary subject.

COURT: That's not the question; not what you believed at the time.

What do you know today? Was the person who fled toward the target house the same person, whom we now know as Mr. Ramirez, that fled in the BMW?

WITNESS: I know as of now that he is not the primary subject.

COURT: Okay. Thank you.

*Id.* at 65-68. Not only was Agent Rivera evasive with Counsel, but also with the Court.

COURT: When you initially saw the first vehicle in the alley, were you at the south end of the alley looking north or the north end of the alley looking south?

WITNESS: We were directly in the middle of the alley looking towards the target, like, directly towards the target house, so I would assume that would be west or east from the –

COURT: So you were directly behind the house?

WITNESS: Correct.

. . .

COURT: Okay. When you left to pursue the suspect to McDonald's, did you or your team drive the vehicle out of the alley?

WITNESS: We were adjacent to the alley, so right on the exit of the alley that connects to the side streets of that block, and we were on foot. So the vehicle was still staged very close in proximity to that alley in the target residence. But when we went to the McDonald's, we were on foot, Your Honor.

COURT: Okay. So, I am just trying to get a layout of the scene here.

When you were looking at the target residence before the first two fled, was your vehicle physically located in the alley?

WITNESS: So, it was physically located on the outside of the alley. Once we already en – so, we entered into the alley and identified where that vehicle was with the primary subject. We exited the alley south and wrapped around and set up a perimeter waiting for our other vehicle to take that southern side, and we were on the northern side. So on both sides of the alley, that's where our team was.

COURT: Okay. So when the suspects originally fled, one to the McDonald's, the vehicle was not physically in the alley.

WITNESS: It was physically in the alley.

COURT: (Pause.)

I thought you said -- so, I'm just trying to make this clear.

WITNESS: Yes, Your Honor.

COURT: I thought you just said that after you initially drove through -- or back behind the residence, which I assume is in the alley?

WITNESS: Correct.

COURT: That you went to the end of the alley or exited the alley and were awaiting another vehicle, correct?

WITNESS: Correct.

COURT: And while you were awaiting another vehicle, that's when the two suspects fled?

WITNESS: While we exited the alley and staged on the other end, the other team vehicle entered in the alley -- the vehicle never left the alley, so --

COURT: I'm not talking about the other vehicle. I'm talking about the vehicle you were in.

WITNESS: Okay, yes. My vehicle was on the opposite end of the alley.

COURT: Okay. So the two vehicles were at the ends of the alley, the egress points?

WITNESS: Yes.

*Id.* at 77-80. Agent Rivera also equivocated about whether McDonald's is a private business, *id.* at 41-42, and his characterization of Ramirez's use of a cellphone near his face, *id.* at 71-74.

On cross examination, Agent Rivera also had several notable lapses in memory. He could not recall: (1) when he first saw Ramirez's BMW, *id*. at 47; (2) where exactly he

first saw Ramirez's car, *id*. at 47-48; (3) if Ramirez's car ever stopped outside 2115 Emerson North, *id.* at 49; (4) how fast Ramirez was driving, *id*. at 54-55; (5) if Ramirez was alone in his car, *id.* at 59; (6) if he was told that Ramirez was a U.S. citizen, and was in fact Native American, *id.* at 63-64; (7) if he was diagnosed with a concussion, *id.* at 75; and (8) where and how many times he hit Ramirez when forcibly removing him from the car, *id.* at 76.

With this credibility in mind, the Court turns to the basis for the suspicion that Agent Rivera articulated. The evidence does not establish that ICE agents had an objectively reasonable suspicion to stop Ramirez. "The validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or fact, was an objectively reasonable one." *United States v. Phillips*, 679 F.3d 995, 998 (8th Cir. 2012). Here, it was not.

First, even crediting Agent Rivera's testimony, ICE agents never observed Ramirez enter or exit the target address, or saw the BMW Ramirez was driving stopped at the address. There is no evidence in the record that Ramirez was seen in the first car (the one that was parked behind 2115), was spotted getting out of that car, was seen fleeing from the car to the McDonalds or the target residence, or was seen getting into the BMW. Hrg. Tr. at 32-33, 38-39, 49-50, 52-53. In other words, ICE agents did not connect Ramirez in any way to Moreno's last known address other than later spotting him in the neighborhood when ICE returned to the alley. *Id.* at 47. This is significant. In *Phillips*, the Eighth Circuit found an officer's mistaken belief objectively reasonable because the defendant matched the target suspect's physical description and was observed

approaching the suspect's house on foot. *Phillips*, 679 F.3d at 998. Similarly, in *United States v. Lopez-Tubac*, the Eighth Circuit held it was objectively reasonable for an officer to mistake the defendant for the target suspect, noting that ICE agents believed the defendant matched the picture of the suspect and observed the defendant emerge on foot from near the suspect's address and "enter the passenger side of a vehicle stopped nearby." 943 F.3d 1156, 1157-58, 1160-61 (8th Cir. 2019). Unlike *Phillips* and *Lopez-Tubac*, there is no evidence—let alone credible evidence—that placed Ramirez at Moreno's last known address.[5] Thus, the mere fact that Ramirez was in a car driving in an urban neighborhood in the general vicinity of the target address does not suffice to establish reasonable suspicion to stop him.

Second, Agent Rivera testified that Ramirez looked like the target of their investigation, of whom he had seen a photograph.[6] A comparison of Moreno's photograph to video footage of Ramirez's arrest shows that Ramirez does not look like the suspect beyond having "black hair," "a medium complexion," and possibly being of "Hispanic origin." *Compare* Def. Ex. 1 *with* Def. Ex. 2; Hrg. Tr. at 14. More importantly, the record does not establish that Agent Rivera ever got a good look at Ramirez. There is no

[5] Agent Rivera testified that a Hispanic male who appeared to match Moreno's description exited a vehicle parked outside 2115 Emerson North, fled on foot, and fled back toward that address fifteen minutes before he observed Ramirez drive by 2115 Emerson North in a different vehicle. Hrg. Tr. at 32, 39, 49-53. This evidence is not an objectively reasonable basis on which to stop Ramirez. To the extent that this testimony could lead the Court to infer from this evidence that Ramirez was present at 2115 Emerson North, the Court notes that this is merely Agent Rivera's belief at the time—a "belief" for which he articulated no facts. But, again, even if Agent Rivera articulated facts rather than his belief, the Court reiterates its finding that Agent Rivera's testimony lacked credibility.

[6] The record does not establish whether Agent Rivera had the photograph with him at the time of the incident and if not, how long prior to the incident he had looked at it. *Id.* at 8, 30.

evidence he saw him outside the BMW or that he observed him through binoculars. The record does not establish how far Agent Rivera's car was from the BMW when he spied Ramirez. Thus, based on the record (and even crediting Agent Rivera's testimony) Agent Rivera only saw Ramirez at a distance through two car windows. Hrg. Tr. at 82. The record does not establish whether either or both of the cars' windows were tinted. At best—and this is what Agent Rivera testified—Ramirez matched the generic description of being a Hispanic male with "medium complexion, black hair." Which is to say, Ramirez was a brown person. Such broad, generic similarities materially differ from the descriptions that courts have relied on to find an officer's mistaken identity was nonetheless reasonable. *Cf. e.g., United States v. Lemons*, 84 F.4th 766, 768 (8th Cir. 2023) (defendant and suspect were of the same race, both had a stocky build, full head of hair, facial hair, and appeared to be in their twenties); *Lopez-Tupac*, 943 F.3d at 1158, 1161 (defendant and suspect both had brown hair, brown eyes and were roughly the same height); *Phillips*, 679 F.3d at 996, 998 (defendant and suspect were the same race, both bald, close in age, and were of similar height). Even if the generic descriptors at issue here might suffice, it does not in this case. Agent Rivera had a photograph of Moreno. Hrg. Tr. at 8. Ramirez does not look like him. *Compare* Def. Ex. 1 *with* Def. Ex. 2.

Moreover, as Ramirez argues, the generic similarities relied on by ICE agents appear to serve as a proxy for Hispanic ethnicity. Dkt. No. 54 at 9. Agent Rivera, who had reviewed the photograph of the suspect, attempted to stop *three different* Hispanic individuals during this encounter because they all appeared to him to match the general description. *Cf. Lopez-Tubac*, 943 F.3d at 1161 (rejecting argument that defendant was stopped because he was Hispanic, like the suspect, because the ICE agent "did not stop

any other Hispanic individuals who lived in [the area], nor did he seek to investigate the Hispanic driver of the car in which [defendant] was riding"); Dkt. No. 38 at 2-3. Agent Rivera also questioned Ramirez's national origin and citizenship status immediately after stopping him. Def. Ex. 2 at 00:20-1:16. An investigative stop is not supported by reasonable suspicion of criminal activity if based solely on an individual's race or ethnicity. *Brignoni-Ponce*, 422 U.S. at 886-87; *Trump v. Illinois*, 607 U.S. ---, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force. Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity."). Therefore, Ramirez's Hispanic appearance cannot, by itself, provide the requisite reasonable suspicion. In short, up to this point, the officers had no reasonable suspicion that Ramirez was in the country illegally.

But, the Government counters, Ramirez's "dangerous and evasive driving" and "refusal to comply with lawful commands" provide the additional grounds necessary to establish reasonable suspicion for this stop. Dkt. No. 38 at 8. The only evidence of Ramirez's "dangerous and evasive driving" comes from Agent Rivera's testimony, which this Court will not credit. Hrg. Tr. at 55. The only credible evidence that Ramirez refused to comply with lawful commands stems from conduct that occurred *after* Ramirez was seized. Def. Ex. 2. This includes Ramirez's refusal to answer questions about his citizenship, which itself is not grounds for reasonable suspicion. *See United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) ("[A]bsent reasonable suspicion justifying a *Terry* investigative stop, the citizen is free to refuse to answer questions and walk away.");

*Florida v. Bostick*, 501 U.S. 429, 435 (1991) ("[W]hen officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." (citations omitted)). Simply put, post-seizure conduct cannot supply justification for the seizure.

ICE stopped Ramirez because he looked Hispanic and was driving a car in the general vicinity of Moreno's last known address. Considering the totality of these circumstances, the Court finds that the agents' initial stop of Ramirez was not supported by reasonable suspicion and therefore violated Ramirez's Fourth Amendment rights.

### B. Subsequent arrest

The Government argues Ramirez's subsequent conduct in forcibly resisting arrest provided independent probable cause for his seizure. Dkt. No. 38 at 8-10. Specifically, Ramirez's act of "physically striking a federal officer in the face with a closed fist" provided an independent probable cause for Ramirez's arrest. *Id.* at 8-10. Ramirez does not dispute that he struck Agent Rivera. Dkt. No. 54 at 10-11.

"Resistance to even an illegal stop or arrest can furnish grounds for a legitimate arrest." *United States v. Pickens*, 58 F.4th 983, 988 (8th Cir. 2023); *see also United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) ("[A] defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest."). By hitting Agent Rivera, Ramirez gave ICE agents sufficient probable cause to arrest him. *See* 18 U.S.C. § 111(a)(1) (A person commits the crime of assaulting, resisting, or impeding federal officers if the person "forcibly assaults, resists, opposes, impedes, intimidates, or

interferes with any [federal officer] while engaged in or on account of the performance of official duties").

### C. Suppression of evidence

Ramirez seeks to suppress all evidence obtained during the entirety of this event, including "the unjustified allegations that he obstructed, impeded or assaulted officers." Dkt. No. 27 at 3. The exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis*, 564 U.S. at 231-32. This rule does not apply when the "causal chain" between an illegal stop and evidence later discovered is broken. *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994). A defendant's physical resistance in response to unlawful conduct has been held to break the chain of causation under the exclusionary rule. *Dawdy*, 46 F.3d at 1431.

Here, ICE agents unlawfully seized Ramirez when they surrounded his aunt's vehicle. Def. Ex. 2. As a result, all identifying evidence, statements or items taken from Ramirez—up until the moment he struck Agent Rivera—should be suppressed as obtained in violation of the Fourth Amendment. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("[T]he Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects'".); *see also United States v. Dolson*, 673 F. Supp. 2d 842, 870 (D. Minn. 2009) (suppressing defendant's statements made to a state trooper as fruit of the poisonous tree). However, when Ramirez hit Agent Rivera the exclusionary rule's chain of causation broke. Accordingly, any evidence recovered after Ramirez hit Agent Rivera need not be suppressed because it is not fruit of the poisonous tree.

For these reasons, the Court recommends granting Ramirez's motion to suppress with respect to all evidence obtained from Ramirez up until the moment Ramirez struck Agent Rivera. The Court recommends denying the motion with respect to all items taken or statements made during or after Ramirez hit Agent Rivera.

## III. Motion to Disqualify [7]

Ramirez also moves to strike the appearance of Government's Counsel, Special United States Attorney (SAUSA) Michael Hakes-Rodriguez (a Judge Advocate General military lawyer (JAG)). Dkt. No. 29. In support of this motion, Ramirez attached as an exhibit a Brief of Amici Curiae by former United States military lawyers.[8] Dkt. No. 29-1. Ramirez contends that the use of JAG lawyers, such as Hakes-Rodriguez, to prosecute civilians in criminal cases violates the Posse Comitatus Act (PCA) and Department of Defense regulations. Dkt No. 29; Dkt. No. 29-1. The Government contests this characterization of the PCA, arguing that the PCA does not apply to the use of JAG lawyers as SAUSAs, and even if it does, this particular use of JAG lawyers falls within a statutory exception to the PCA. Dkt. No. 35. The Court finds the Attorney General's decision to appoint JAG lawyers as SAUSAs to prosecute civilians in criminal cases is

---

[7] After Ramirez moved to strike the appearance of SAUSA Michael Hakes-Rodriguez, the Government made three successive substitutions of counsel, replacing SAUSA Hakes-Rodriguez with SAUSA William L. Richards, Dkt. No. 33, replacing SAUSA William L. Richards with SAUSA Robert G. Tucker III, Dkt. No. 50, and replacing SAUSA Robert G. Tucker III with SAUSA Nicholas R. Grey, Dkt. No. 63. Accordingly, Ramirez's motion to strike the appearance of SAUSA Hakes-Rodriguez is now moot. Nonetheless, the Court addresses the merits of this motion to the extent Ramirez forwards similar arguments regarding the appearance of SAUSA Grey or argues that Hakes-Rodriguez's appearance in this case taints the remainder of the prosecution.

[8] Neither Ramirez nor the Amici moved for leave to file an Amici Curiae Brief. Nonetheless, the Court has reviewed and considered the arguments made in the amicus brief.

expressly authorized by two "Acts of Congress"—28 U.S.C. § 543 and 10 U.S.C § 806(e)(1)—and as such, constitutes an exception to the PCA. For this reason, the Court denies Ramirez's motion to disqualify.

### A. The Posse Comitatus Act

The PCA is a criminal statute that states:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385. The PCA exists "for the purpose of limiting the direct active use of federal troops by civil law enforcement officers to enforce the laws of this nation." *United States v. Wooten*, 377 F.3d 1134, 1139 (10th Cir. 2004) (quoting *United States v. Hutchings*, 127 F.3d 1255, 1257 (10th Cir. 1997)).

Here, both parties agree exceptions to the PCA can exist "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385; Dkt. No. 29 at 3; Dkt. No. 35 at 5. But the parties disagree on whether the statutes on which the Government relies to appoint JAG lawyers as SAUSAs constitute express exceptions to the PCA. Dkt. No. 29 at 1; Dkt No. 35 at 3-8; Dkt. No. 54 at 18-24.

### B. Statutory exceptions

The Government asserts that two statutes—28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1)—are exceptions to the PCA that expressly authorize the use of JAG lawyers as SAUSAs in criminal matters.[9] Dkt. No. 35 at 4; Dkt. No. 59 at 5. Two recent cases

[9] The Government identifies 10 U.S.C. § 806(d)(1) as the relevant statutory exception in its response in opposition to Ramirez's motion to disqualify. Dkt. No. 35 at 5. But that

considered this very question—whether "the Attorney General's appointment of JAG lawyers as SAUSAs in the District of Minnesota to prosecute civilians" is authorized by 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1). *United States v. Redmond*, No. 26-mj-99, 2026 WL 1196702 (D. Minn. May 2, 2026); *United States v. Johnson*, No. 26-mj-81, 2026 WL 1194953 (D. Minn. May 1, 2026). In both cases, the court concluded that Congress, in passing these two statutes, "specifically granted the Attorney General the authority to appoint SAUSAs without limitation," which includes the authority "to prosecute civilians in criminal cases." *Johnson*, 2026 WL 1194953, at *4-5; *Redmond*, 2026 WL 1196702, at *5-6. In reaching this conclusion, the court reasoned that the plain language of 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) unambiguously authorizes the Attorney General to appoint military lawyers as SAUSAs and represent the United States in criminal cases. *See Redmond*, 2026 WL 1196702, at *3-6. The Court finds this reasoning persuasive for several reasons.

First, the parties in this case forward strikingly similar arguments to those raised in *Redmond* and *Johnson*. *See* Dkt. Nos. 29, 29-1, 35, 54, 59. Indeed, Ramirez and amici curiae provide nearly identical briefs to those submitted in *Johnson. Compare e.g.,* Dkt. No. 29 and Dkt. No. 29-1 *with* Dkt. No. 24 (Defendant's Motion to Strike), Dkt. No. 39-1 (Amici Curiae Brief), *Johnson*, No. 26-mj-81 (D. Minn. 2026).

---

statute is inapposite. *See* 10 U.S.C. § 806(d)(1) ("No person who, with respect to a case, serves in a capacity specified in paragraph (2) may later serve as a staff judge advocate or legal officer to any reviewing or convening authority upon the same case."). Because the Government quotes 10 U.S.C. § 806(e)(1) throughout its response and later cites section 806(e)(1) as the relevant statutory exception in its post-hearing briefing, the Court treats this incorrect identification as a citation error. Dkt. No. 35 at 6; Dkt. No. 59 at 3-11.

Second, the Court's own analysis of the plain language of 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) establishes that these statutes expressly authorize the use of JAG lawyers as SAUSAs, thus operating as an exception to the PCA. The plain language of 28 U.S.C. § 543 places no restrictions on who the Attorney General may appoint as a SAUSA. Nor does 10 U.S.C. § 973(b) somehow impose these restrictions. Indeed, 10 U.S.C. § 973(b)(2)(B) expressly permits JAG lawyers to "hold or exercise the functions of a civil office in the Government of the United States . . . when assigned or detailed to that office or to perform those functions." 28 U.S.C. § 543 merely creates a pathway for this assignment. Similarly, the plain language of 10 U.S.C. § 806(e)(1) states:

> A judge advocate who is assigned or detailed to perform the functions of a civil office in the Government of the United States under section 973(b)(2)(B) of this title may perform such duties as may be requested by the agency concerned, including representation of the United States in civil and criminal cases.

10 U.S.C. § 806(e)(1). Section 806(e)(1) thus unambiguously authorizes JAG lawyers assigned to an agency like the Department of Justice to perform the functions of that agency, including the prosecution of "criminal cases."

To circumvent this plain language, Ramirez invites the Court to rely on each statute's legislative history. Dkt. No. 54 at 16; Dkt. No. 29-1 at 16-18. The Court declines this invitation. "When a statue is plain and unambiguous, as [these are], the courts cannot resort to legislative history to interpret it." *Cont. Freighters, Inc. v. Sec'y of U.S. Dep't of Transp.*, 260 F.3d 858, 862 (8th Cir. 2001). Because the statutes at issue have a plain and unambiguous meaning with regard to the parties' particular dispute, the Court will not delve into their legislative history.

Ramirez further argues that 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) do not expressly authorize an exception to the PCA because they fail to satisfy the framework applied by the Supreme Court when interpreting similar language in the Anti-Injunction Act. Dkt. No. 54 at 14-25. In *Mitchum v. Foster*, the Supreme Court addressed the criteria used to determine whether a statute is "expressly authorized" as an exception to the Anti-Injunction Statute. 407 U.S. 225 (1972). The Supreme Court concluded that to qualify as an "expressly qualified exception" to the anti-injunction statute, the Act of Congress "need not contain an express reference to that statute," "need not expressly authorize an injunction of a state court proceeding," and "must have created a specific uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Id.* at 237.

While the Court finds *Mitchum* instructive in determining what qualifies as an expressly authorized exception under the PCA, Ramirez's interpretation of *Mitchum* is flawed. First, Ramirez cites *Mitchum* for the proposition that a federal law "need not contain an express reference" to the statute to serve as an exception nor must it expressly authorize a specific type of military use. Dkt. No. 54 at 14-15. Yet in that same breadth, he asserts that 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) are not express exceptions because they do not specifically state that the Department of Justice can use JAG officers to prosecute civilians. *Id*. at 18-19. In other words, Ramirez argues in favor of the type of rigid specificity rejected in *Mitchum*. Additionally, Ramirez incorrectly cites *Mitchum* for the proposition that an Act of Congress constitutes an express exception if "on its face and in every one of its provisions . . . [it] is totally incompatible with the prohibition [to which the exception applies]." *Id.* at 15. But the Supreme Court expressly rejected this

proposition in *Mitchum* when it stated, "*This is not to say* that in order to come within the exception an Act of Congress must, on its face and in every one of its provisions, be totally incompatible with the prohibition of the anti-injunction statute." 407 U.S. at 237-38 (emphasis added). In other words, there is no requirement that 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1) must be "totally incompatible" with the PCA to constitute expressly authorized exceptions. *See id.*

For these reasons, the Court finds that the appointment of JAG lawyer, Hakes-Rodriguez, to serve as a SAUSA in this case is authorized by 28 U.S.C. § 543 and 10 U.S.C. § 806(e)(1).

### C. Regulations

Lastly, Ramirez argues that the appointment of JAG lawyers as SAUSAs violates Department of Defense regulation 32 C.F.R. § 516.4 and Army Regulation 27-10. Dkt. No. 29-1 at 16; Dkt. No. 54 at 26-27. The court addressed these same arguments in *Redmond* and *Johnson*, concluding that even if these regulations "recognize that having military lawyers prosecute civilians in cases that lack a military nexus would be ill-advised, these regulations do not authorize [the] Court to strike the appearance of a SAUSA that the DOJ appointed." *Redmond*, 2026 WL 1196702, at *7-8; *Johnson*, 2026 WL 1194953, at *5-7. This Court agrees. Neither the Department of Defense's regulations, nor the PCA itself, grant this Court the authority to strike the appearance of JAG lawyer Michael Hakes-Rodriguez. Ramirez's motion to dismiss is denied.

## IV. Motion to Compel

Ramirez moves to compel discovery. Dkt. No. 30. He seeks thirteen categories of discovery "in order to enable the defense to prepare and sufficiently present their pretrial

motions." *Id.* The Government opposes the motion in part, arguing that it has already complied with its Rule 16 obligations and continues to comply with its obligations under *Brady v. Maryland*, 373 U.2 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Dkt. No. 37 at 2. The Government further contends that, to the extent it has not provided the requested discovery, this discovery is outside the scope of Rule 16 and its obligations under *Brady* and *Giglio. Id.*

"[I]n criminal cases, the prosecution's 'discovery obligation is rooted in two separate sources:' Rule 16 and the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution." *United States v. Ivers*, No. 22-cr-00341, 2023 WL 2182327, at *2 (D. Minn. Feb. 23, 2023) (quoting *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1073-74 (D. Mont. 2005)). Pursuant to Federal Rule of Criminal Procedure 16(a)(1), the Government must "disclose, among other things, and upon the defendant's request, a defendant's oral, written, or recorded statement; and documents and objects within [its] possession, custody, or control that are material to the defense, intended to be used in the government's case-in-chief, or from the defendant." *United States v. Tavlin*, No. 22-cr-134, 2023 WL 3477610, at *3 (D. Minn. May 16, 2023) (citing Fed. R. Crim. P. 16(a)(1)(A), (B), (E)). Under *Brady*, the Government must "disclose any evidence favorable to the defendant . . . that is 'material either to guilt or to punishment.'" *United States v. Primm*, 63 F.4th 1186, 1192 (8th Cir. 2023) (quoting *Brady*, 373 U.S. at 87). And under *Giglio*, the Government must also disclose evidence that is relevant to a witness's credibility. 405 U.S. at 154-55. Material evidence is evidence which is "helpful to the defense," *United Staes v. Vue*, 13 F.3d 1206, 1208 (8th Cir. 1994). However, a

"mere conclusory allegation that the requested information is material" is not sufficient. *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985) (quotation omitted).

The Court denies as moot Ramirez's Requests enumerated as 1, 2, 3, and 8 as they are duplicative of the Court's Arraignment, Motions, and Case Management Order, Dkt. No. 22, and because the Government has agreed to locate and produce all relevant documents within these categories. Dkt. No. 37 at 3-4. The Court also denies as moot Ramirez's Requests 4 and 13 because such discovery is covered under *Brady* and *Giglio*, and therefore also addressed by the Court's Arraignment, Motions, and Case Management Order. Dkt. No. 22.

The Court denies Ramirez's remaining requests, Requests 5, 6, 7, 9 ,10, 11, and 12. Dkt. No. 30. at 2-4. Request 9 is denied because it requests information that is not subject to disclosure pursuant to Rule 16(a)(2). *Krauth*, 769 F.2d at 476. Request 11 is also denied because it requests information not subject to disclosure. *See United States v. Williams*, No. 23-cr-236, 2024 WL 4589865, at *17 (D. Minn. Oct. 28, 2024) ("[D]rafts of affidavits are considered opinion work product that are entitled to absolute protection from disclosure.") (collecting cases), *R&R adopted in part*, 2024 WL 5004473 (D. Minn. Dec. 6, 2024). Request 12 is denied as duplicative of Request 5. Requests 5, 6, 7, and 10 are denied because they are overbroad and Ramirez has provided no explanation as to how such requests fall within Rule 16. Dkt. No. 30 1-4.

## V. Motion for Early Disclosure of Jencks Act Material

The Jencks Act provides for full disclosure of a witness's previous statements following their testimony on direct examination. 18 U.S.C. § 3500(a)-(b). It further specifies that such documents need not be turned over at an earlier time. *Id.* Ramirez

requests early disclosure of Jencks Act material citing possible trial delays. Dkt. No. 31. But the Court cannot issue an Order requiring the "early" disclosure of Jencks Act material. *See United States v. Sturdivant*, 513 F.3d 795, 803 (8th Cir. 2008); *see also United States v. Douglas*, 964 F.2d 738, 741 n.2 (8th Cir. 1992). Therefore, the Court denies Ramirez's motion for early disclosure of Jencks Act Material. The Court notes the Government's agreement to provide reciprocal Jencks Act disclosures three days before trial. Dkt. No. 34.

## RECOMMENDATION

For the reasons stated above, the Court RECOMMENDS THAT:

1. Ramirez's Motion to Dismiss for Outrageous Government Misconduct (Dkt. No. 28) be DENIED.

2. Ramirez's Motion to Suppress (Dkt. No. 27) be GRANTED IN PART AND DENIED IN PART.

## ORDER

The Court being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

IT IS HEREBY ORDERED that:

1. Ramirez's Motion to Disqualify Government's Counsel (Dkt. No. 29) is **DENIED**.

2. Ramirez's Motion to Compel Discovery (Dkt. No. 30) is **DENIED**.

3. Ramirez's Motion for Early Disclosure of Jencks Act Material (Dkt. No. 31) is **DENIED**.

Dated: August 21, 2026

s/ David T. Schultz
DAVID T. SCHULTZ
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).