UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 26-MJ-45 (KMM/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSE ROBERTO RAMIREZ,

Defendant.

**GOVERNMENT'S OBJECTION TO REPORT AND RECOMMENDATION**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Nicholas Grey, Special Assistant United States Attorney, hereby objects in part to the Order & Report and Recommendation ("R&R", Doc. 65). The U.S. objects to the finding that DO Rivera's testimony was not credible and the conclusion that "agents' initial stop of Ramirez was not supported by reasonable suspicion and therefore violated Ramirez's Fourth Amendment rights." Pursuant to 28 U.S.C. § 636(b)(1), the U.S. requests the Court "make a de novo determination of those portions … to which objection is made" and "receive further evidence[.]"

## I. Background

At the April 22, 2026, motions hearing Deportation Officer (DO) Paul Rivera testified for the U.S. The Defense offered a target sheet (Def. Ex. 1)

and video of Ramirez's arrest (Def. Ex. 2). The R&R found "Agent Rivera to be not a credible witness" and instead relied "on the objective evidence and on undisputed facts." Footnote 1.

The U.S. concurs broadly with the summary of facts provided at pages 2-3 of the R&R, specifically that on January 8, 2026, eight ICE agents including DO Rivera went to 2115 Emerson Ave North in Minneapolis to arrest Ecuadorean national Charly Pallo Moreno. DO Rivera spotted two males roughly matching Moreno's description in a car behind the house. The males fled on foot in different directions, one to a nearby McDonalds. Agents were unable to enter the McDonalds and returned to the target address, near which they saw an individual (who would turn out to be Ramirez) driving past. The agents believed the driver sufficiently matched Moreno's description to merit an investigative stop. DO Rivera testified that Ramirez drove recklessly when pursued, giving further basis for the eventual stop. The R&R rejects this testimony.

## II. Agents Had Reasonable Suspicion to Conduct an Investigative Stop

The R&R characterizes this as a case of naked, unconstitutional racial profiling. In reaching this characterization the R&R overlooks much of the evidence available to the agents and misapplies precedent.

### 1. The R&R omits facts relevant to DO Rivera's identification

"At best—and this is what Agent Rivera testified—Ramirez matched the generic description of being a Hispanic male with 'medium complexion, black hair.' Which is to say, Ramirez was a brown person." R&R, 18. The R&R's characterization of DO Rivera's identification as merely that of a "brown person" is a material oversimplification. DO Rivera testified "I saw a male with black hair and a medium complexion with a Hispanic origin." ECF Doc. 45, hearing transcript ("Tr.") 14. Importantly, however, DO Rivera also testified "His appearance appeared to match the primary target's appearance." *Id*. This reference to the "target's appearance" is in reference to the target sheet for Moreno that DO Rivera had access to on January 8. *Id*. 30 and Def. Ex. 1. Accordingly, DO Rivera was implicitly comparing the appearance of Ramirez with the photograph of Moreno. DO Rivera should be understood as endorsing the relevant features of Moreno's photograph.

Moreno and Ramirez do share several features. See Def. Exs. 1 and 2. Both are younger men in the age range of 20-35. Their hair length is similar and both have a full head of hair. Both have a broad nose and full eyebrows. Neither has any visible tattoos or scars. Both have dark brown eyes. Their skin tone is similar; a slight difference in hue could be a product of the lighting and color balance for the photos rather than physiological

differences. Both men appear similar in terms of build; neither is obese or skinny.

There are features that distinguish the men. Most notably Ramirez is depicted with a thin goatee that is at least a few weeks old and his hair lays flat, compared to Moreno's clean-shaven depiction and hair that stands up, perhaps with the application of styling gel. The photo of Moreno was apparently taken on or prior to the EOIR IJ Decision Date of 9/4/2025, so DO Rivera could be expected to focus on the more durable characteristics (skin tone, hair and eye color, approximate age, lack of scars/tattoos, and body habitus) as opposed the more malleable characteristics such as hair style and facial hair. Moreno's hair might look very similar to Ramirez's if the former omitted hair gel for the day or his hair had been compressed by a hat (a common occurrence in Minnesota's January weather). In any event, Ramirez appears to have been wearing a hood when arrested. Def. Ex. 2, 0:57. Moreno might also have grown a short goatee in the passage of time between when the photograph was taken and when DO Rivera attempted to locate Moreno on January 8, 2026.

**2. The R&R misapplies case law**

The R&R applies an overly exacting standard of identification required for an investigative stop that is not supported by case law. The R&R analogizes the present facts to one case that is clearly distinguishable, while

attempting to distinguish the present facts from three cases that are on point.

The R&R seeks to distinguish the present facts from three precedential cases in this circuit where evidence obtained pursuant to a mistaken-identity stop was admitted. *United States v. Lemons*, 84 F.4th 766, (8th Cir. 2023); *United States v. Lopez-Tupac*, 943 F.3d 1156 (8th Cir. 2019); and *United States v. Phillips,* 679 F.3d 995 (8th Cir. 2012). The R&R misreads these cases as having substantially stronger identifications than the present case.

In *Lemons* the police were conducting surveillance of a residence looking for Williams, "a six-foot-tall African American male in his twenties with a stocky build, full head of hair, and a beard that wrapped around his face." 84 F.4th 766, 768. Later, the defendant Lemons left the apartment. He is described as "a five-foot-three African American male in his twenties with a stocky build, full head of hair, and a goatee." *Id.* Lemons fled on foot when officers approached and was apprehended with a firearm. *Id.* at 769. The Court of Appeals sustained the denial of Lemon's motion to suppress, finding: "The totality of the circumstances established reasonable suspicion of criminal activity sufficient to detain Lemons." *Id.* at 770.

*Lemons* presents a case with only general visual similarities between the intended target and eventual defendant. Williams and Lemons had some similarities: race, build, full head of hair, age range, and some facial hair.

They differed dramatically in height (six feet versus five-foot-three). Their facial hair differed (goatee versus wrap around facial hair). There is no description of hair style/length, nor the presence or lack of tattoos/scars. In this case DO Rivera similarly considered complexion, build, full head of hair, and age range, as well as proximity to the target residence, when assessing whether Ramirez sufficiently matched Moreno's target sheet to justify an investigative stop.

In *Lopez-Tubac* the Court of Appeals found the arresting officer's mistake of identity to be objectively reasonable where "Lopez-Tubac and the suspect both have brown hair and brown eyes and are roughly the same height, and the magistrate judge found that Lopez-Tubac 'closely resembled' the suspect as depicted in the photograph that Callison possessed." 943 F.3d 1156, 1160. The decision notes that the investigator passed within thirty feet of Lopez-Tubac and observed him for ten to fifteen seconds. *Id*. at 1158. Although there was a 30-pound weight difference between Lopez-Tubac and the target, the Court of Appeals concluded "some variance in height or weight is not unreasonable" given that the investigator "observed Lopez-Tubac from a distance of thirty feet[.]" *Id*. at 1160.

It should be noted here that the *Lopez-Tubac* court considered difficulties in observing a defendant to be supportive of a reasonable mistake, rather than undermining reasonable mistake. The R&R seems to take the

opposite approach. It notes a number of factors that would make it difficult for DO Rivera to preclude Ramirez as matching the particulars of Romero. The R&R summarizes a lack of evidence to show whether DO Rivera initially saw Ramirez outside his car, the distance between Rivera and Ramirez, whether Rivera used binoculars, and whether the vehicles had tinted windows. Pages 17-18. The R&R seems to support, therefore, that while DO Rivera might have been able to observe the general characteristics of Ramirez, he would not have been able to assess his particular features sufficiently to contrast them with those of Moreno. This supports that DO Rivera's mistaken identification of Ramirez was genuine and reasonable. As in *Lopez-Tubac*, DO Rivera had a sufficient vantage point to match the defendant to the generalized characteristics, but inadequate time or proximity to perform a detailed or side-by-side comparison. This could be fatal to a probable cause arrest, but the question is whether DO Rivera possessed sufficient information to justify an investigative stop of Ramirez, not arrest him.

*Phillips* is the third case the R&R seeks to distinguish. *Phillips* is also an example where generalized physical characteristics, in combination with proximity to a location of interest, was sufficient to conclude that an officer made a reasonable mistake when misidentifying a defendant as a target. 679 F.3d 995. In *Phillips,* police were investigating a shooting and looking for "a

black male in his mid-thirties, who stands six feet tall, weighs two hundred fifteen pounds, and is bald." *Id.* at 996. Two days after the shooting, police observed Phillips near the address where the shooting occurred. *Id.* The opinion provides only a general description of Phillips as "a six-foot, two-hundred pound, thirty-eight year old, bald black man[.]" *Id.* 998. The opinion notes that the arresting officer's initial observation of Phillips was brief and from a distance. *Id.* Based on this brief observation of generic descriptions, in combination with the proximity to the crime scene of two days earlier, the officers initiated an investigative stop of the vehicle containing Phillips. The Court concluded the officer's "mistake was objectively reasonable, the stop did not violate the Fourth Amendment." *Id.*

The R&R does not cite to any cases where a stop based on mistaken identity was found to be unreasonable. Instead, the R&R relies on a case where a blanket check-point stop for people of Mexican descent was found to be unconstitutional. *United States v. Brignon-Ponce*, 422 U.S. 873 (1975). *Brignoni-Ponce* does not involve any sort of search for a target suspect, but merely a fixed traffic checkpoint on an interstate highway where officers stopped the defendant, "saying later that their <u>only</u> reason for doing so was that its three occupants appeared to be of Mexican descent." *Id.* at 875 (emphasis added). The Supreme Court invalidated the stop, stating: "In this case the officers relied on a <u>single</u> factor to justify stopping respondent's car:

the apparent Mexican ancestry of the occupants." *Id*. at 885–86 (emphasis added).

*Brignoni-Ponce* is a case of plain and simple racial profiling, inapplicable to the present case. In order to apply *Brignoni-Ponce* the R&R unfairly characterizes DO Rivera's search parameters as merely that of a "brown person" and accordingly concludes "Therefore, Ramirez's Hispanic appearance cannot, by itself, provide the requisite reasonable suspicion." Pages 18 and 19. But Rivera was not conducting a generalized search for people of "Hispanic appearance." Rivera was searching for a specific person that was (1) an adult, (2) male, (3) with medium complexion, (4) with black hair, (5) that matched the photo of Moreno (i.e. medium build, no visible scars, no visible tattoos, medium length hair, young adult), and (6) in the vicinity of the last known address of Moreno, a man subject to a final removal order. The agents had further reason to believe Moreno was then in the area as just minutes before two men generally matching Moreno's description ran from a car behind the target house.

The R&R misunderstands that a general description can be a valid basis for multiple investigative stops. This misunderstanding is exemplified in one line: "*Both* men 'matched' Moreno's description." Page 3 (italics and quotation marks in original.) Similarly, "Agent Rivera, who had reviewed the photograph of the suspect, attempted to stop *three different* Hispanic

individuals during this encounter because they all appeared to him to match the general description." Page 18. The italics and quotation marks setting off their respective words imply that an objective mistake as to more than one person is a legal impossibility. A probable cause arrest of two people based on a single identity would seem to be a legal impossibility (logically it would not be possible to meet the 'more likely than not' standard for than one person at a time.) But an investigative stop requires a lower burden of mere reasonable suspicion and multiple people can fit within a general description; reasonable investigative stops of more than one person is not a logical inconsistency. It is not unreasonable that officers would conduct an investigative stop of all three individuals that fled the vicinity of a target address where each individual met the general description of the target suspect and the officers needed to see each individual up-close before precluding any as a match.

**III. DO Rivera Testified Credibly**

The R&R finds "Agent Rivera is simply not a credible witness." Page 9. In consequence of this assessment the R&R rejects DO's Rivera's testimony that Ramirez drove away from agents at excess speeds, erratically, and failed to stop at traffic signals. The R&R does not point to extrinsic evidence contradicting DO Rivera's testimony, internal inconsistencies, or suggest it is

inherently implausible. Instead, the R&R over-interprets awkward testimony that might reasonably be expected from a brand-new agent.

The R&R faults DO Rivera for "dodg[ing] questions about the length of his ICE training[.]" Page 9. DO Rivera had already testified to joining Immigration and Customs Enforcement in September of 2025 and provided no prior law enforcement experience. Tr. 6. This was just three to four months prior to the arrest of Ramirez, so DO Rivera was not attempting to imply ample experience. Indeed, his status as a very new law enforcement officer likely explains many of the difficulties noted in the R&R. Law enforcement officers strive for a high level of precision and accuracy in their testimony, but it can take some time and practice to develop that capability. In the meantime, that attempt to maintain perfect accuracy can come off as argumentative and reluctant to concede points. This is distinct from deception.

The R&R gives examples of "notable lapses in memory." Page 15. These are not instances of conveniently "forgetting" so as to avoid a dangerous question. They are instead instances of DO Rivera not wanting to provide more detail than he possessed. The R&R notes, for instance, that DO Rivera could not recall when he first saw Ramirez's BMW. His response was "I cannot recall the exact time duration of when we saw the vehicle, plus the initial encounter at the target residence." Tr. 47. He added, "It was very

shortly after we returned from the McDonald's that we identified the BMW." *Id.* No one at the hearing asked DO Rivera to provide a time estimate or range of possible times.

Similarly, the R&R notes that DO Rivera did not recall where he first saw the BMW. DO Rivera testified "He was in the general vicinity of the alleyway." Tr. 47. He was further questioned whether this was "in the alleyway or near the alleyway?" Tr. 47-48. DO Rivera responded "Those roads are very close in proximity to the target residence." Tr. 48. A witness might be forgiven for not recalling months later whether the initial sighting was "in the alleyway" or "near the alleyway." Had DO Rivera wanted to bolster his case he could easily have said "in the alleyway," but he presented his recollections, ambiguities and all, to the Court.[1]

The R&R ignores evidence that corroborates DO Rivera's testimony. The R&R claims "[t]he only evidence of Ramirez's 'dangerous and evasive driving' comes from Agent Rivera's testimony, which this Court will not credit." Page 19. Defense Exhibit 2 does show that at least one of the ICE vehicles had flashing white lights (0:00 to 0:12). The officer on the driver's side (not DO Rivera, who was at the passenger's side)[2] asks "so why were you

[1] The R&R lists other alleged lapses and evasions. Each of these could be more deeply analyzed in similar fashion, but the United States shall limit such discussion in light of the word count restriction.

[2] The video at this point appears to be in mirror mode where the aunt, in the driver's seat, appears to be on the right side of the car.

guys running?" *Id.* 1:20. Ramirez's aunt doesn't deny, but justifies: "you guys are scary people." The officer states "the people that were running from us ran into your house." *Id.* at 1:28. This captures his subjective belief at the time of stopping Ramirez, even if mistaken.

The R&R's rejection of DO Rivera's testimony is further disconcerting because Rivera's testimony is not contradicted by any other testimony or evidence, nor is it inherently implausible. The R&R rejects DO Rivera's contention that pursuing Ramirez was part of a good-faith attempt to locate Moreno, whom Rivera believed to have a violent criminal history and subject to a final removal order. The R&R has not fully explored the plausibility of the implicit alternative.

DO Rivera testified that his team was attempting to locate Moreno at his last known address at 2115 Emerson. Apprehending Moreno appeared to be the tasks at hand for the team that morning. There is nothing inherently implausible about the agents seeing Ramirez near the target address and seeking to ascertain whether he was Moreno. If DO Rivera and the team believed that Ramirez was their target it is plausible that they would abandon the perimeter at the target address and instead follow Ramirez all the way to the HyVee/Starbucks at Bottineau Blvd, some 2.5 miles away by most direct route. It is not inherently implausible that the Agents would activate their lights and that Ramirez would not immediately stop, but

instead speed and run red lights, especially given the anti-ICE sentiment in the city at that time. It seems highly implausible, by contrast, that the entire team would abandon the morning's mission of tracking down Moreno simply to apprehend a "brown person" at random, as seems to be suggested by the R&R. It seems implausible that the Agents would follow Ramirez for several miles and for several minutes without signaling for him to pull-over; they would presumably want to apprehend him quickly and move on with their day. It seems implausible that Ramirez would have called his aunt to coordinate meeting her in the HyVee/Starbucks parking lot if there had been no visible law enforcement activity to give him concern.

Defense Exhibit 2 shows Ramirez refusing to comply with the Agents' commands to exit the vehicle. It does not seem implausible that Ramirez would also have refused to pull-over in response to the Agents' lights and sirens.

## IV. Request to Submit Further Evidence

The U.S. also requests the Court to "receive further evidence" under 28 U.S.C. § 636(b)(1), specifically the post-arrest interview of Ramirez and the corroborating testimony of the other agents.

Ramirez made a recorded statement to HSI officers after his arrest. This recording would have been available to impeach Ramirez if he testified that he had not been speeding. The R&R rejects DO Rivera's testimony that

Ramirez was speeding, even though neither Ramirez nor any other witness contradicted this testimony. If the Court is inclined to find that DO Rivera's uncontroverted testimony is false, the U.S. requests to offer Ramirez's recorded interview.

In the recorded interview Ramirez states, "I see immigration, I could tell, and they just start chasing …they just got [indistinguishable, possibly "bombed"] and all the sudden they turned the lights…" (2:28). He states he knew they were immigration and he called his aunt. Later in the interview he also states "they just started chasing me." (22:22). He further states that after five minutes of following the agents put on their masks. (22:30). Ramirez's characterization of "chasing" is corroborative of DO Rivera's testimony that Ramirez had been driving at high speed.

If DO Rivera's uncontroverted testimony is still in doubt, other agents from that morning's arrest may also be able to testify and corroborate.

## V. CONCLUSION

The United States request the Court not adopt the R&R finding that the stop of Ramirez was not supported by reasonable suspicion and therefore violated the Fourth Amendment. Pursuant to 28 U.S.C. § 636(b)(1), the U.S. requests the Court receive further evidence in the form of Ramirez's post-Miranda statement and corroborative testimony of other eyewitness agents.

Dated: September 11, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*s/Nicholas R. Grey*
BY: Nicholas R. Grey
Attorney ID No.: 283780CA
Special Assistant U.S. Attorney
300 South 4th Street, Suite 600
Minneapolis, MN 55415
T: 612.664-5600 | C: 202-256-7915
Email: Nicholas.Grey@usdoj.gov

***Local Rule 72.2 Certificate of Compliance***

I certify in compliance with Local Rule 72.2 that the above Objection contains 3,484 words as counted by Microsoft 365 Word Version 2607, excluding caption, signature-block text, and certificate of compliance.

*s/Nicholas R. Grey*
Nicholas R. Grey
Attorney ID No.: 283780CA
Special Assistant U.S. Attorney